Hear ye, hear ye, Mr. Honorable Appellate Court for the Second Judicial Dismissal. It is now back in session. The Honorable C.J. F. Hutchinson resigns. Please be seated. Your Honor, the final case on the docket this morning is 2-23-0232. The appeal of the State of Illinois Constituent Appellate v. Leonard J. Zerbst to the defendant's partners. Arguing on behalf of the appellate, Mr. John Rodasiewicz. Arguing on behalf of the appellate, Ms. Stephanie Hoyt Lee. All right, still good morning, everyone. And Mr. Rodasiewicz, you may proceed. John Rodasiewicz on behalf of the appellate, Leonard Zerbst. When a defendant who's been charged with a criminal offense and found unfit is ordered to undergo treatment to restore the defendant to fitness, those treatment efforts have been unsuccessful, that treatment term can be extended under Section 10425A. If there's a finding that the person is not not guilty, which is an innocence-only proceeding, essentially means that there's sufficient evidence to sustain a conviction so as to continue efforts to restore. Before you get into the merits of the argument, tell us what order or orders that we have jurisdiction over. Counsel for the defendant in the trial court filed five different notices of appeal by different counsel. Which orders are before us? What do we have jurisdiction over? I believe we have jurisdiction over the order, finding that Mr. Zerbst was subject to civil commitment under subsection G2. That was entered as a result of the hearing in February of 2023. And I believe we also have jurisdiction over the order entered in September of 2023, finding that he's in need of inpatient care. That he's mentally ill and is in need of inpatient care. So those are essentially the two orders. Do you want to address the state's forfeiture argument, that you forfeited your statutory construction argument? I do. And assuming there was a forfeiture, should we hear it anyway? We can excuse the forfeiture. Well, first of all, I don't think it was forfeited either. And by forfeiture of the statutory construction argument, I think the court means in the trial court, because there wasn't a specific objection in the trial court. Well, I do want to say this, that when Mr. Conroe, the defense attorney, was arguing, he was responding to the state's argument, which was made under the first prong of subsection G2, whether the person is subject to involuntary admission. As he was making that argument and going through the factors for an involuntary admission under section 119, the court interrupted him and said, my read I'm looking at is that you need to address whether it's a serious threat to public safety, G2. Mr. Conroe responded, Judge, my read of the statute is different. He then made comments about the statutory text, saying that essentially the statutory text says, the person is either subject to involuntary admission or a serious threat to public safety. And the court, he went on to say, you know, I can address the serious threat prong if the court chooses. It's essentially if this court were to ask me to address how the NGRI statute impacts involuntary admission, I would respond to it. I would say my read of section G2 is somewhat different. I would still respond to it. I'm not conceding that the NGRI statute under the Code of Corrections applies necessarily to G2, but I'll certainly respond to the argument. And counsel was essentially, it was essentially uncontested that Mr. Zerbs was suffering from delusional disorder. So, and to secure a civil commitment, there has to be both, at least for a mentally disordered individual, there has to be both a mental disorder, that mental disorder has to be serious, which means it causes them, makes them likely to engage in physical harm or engage in conduct that places someone else in physical harm, and that they're dangerous. And counsel's argument essentially was as to the latter. He's not dangerous, which is, I mean, both prongs of G2, the involuntary admission and the serious threat to public safety both encompass, in a sense, a dangerousness prong. So I don't think he waived it in the trial court by not specifically objecting to it. And the cases I did cite in my brief was one of them was Buck, where it's where it was a death penalty case, and the attorney had asked for a pretrial hearing about the death penalty, said it would save judicial resources to do this ahead of time. The court denied it. There was a trial. And at the trial, in the trial phase, the jury learned that the victim was a police officer or a peace officer. He then, on appeal, said, well, the court should have held the pretrial hearing because the jury learned at trial that the victim was a peace officer. They wouldn't have learned that otherwise. And that influenced the outcome of the criminal case, the guilt phase of the trial. Different, different argument that he made in the trial court. And the court excused that. They said, listen, it's close enough. It's close enough. And so I certainly think that Mr. Conroe's argument, where he is making an argument, that Mr. Sturtz, he's not subject to involuntary admission under the code. He's interrupted by the judge. The judge says, I want you to address something else. He says, fine, I'll address that judge. He's not dangerous under either prong and raises that in a post-trial motion, which is, again, not required in a non-jury case, but raises that issue in the post-trial motion. I don't think it's waived. Certainly didn't acquiesce to the judge's interpretation of the law. And even if the court were to find that it wasn't adequately preserved, you can reach it under the plain error doctrine. The Boston case that's cited in my brief has to do with a jury note. The jury had sent out a note. The defense attorney says, well, I think you should answer it one way. The judge winds up answering it a different way. He doesn't object. It's not really clear. And the court in that case said, in the absence of clear invited error, we apply the plain error rule. And I know that the State had also asked, and I didn't object, to citing a 2012 case from this district. People v. Harding. What does Harding have to do with this case? I believe, I don't want to speak for the State, but I believe the State wanted to cite it simply for the fact, simply to state that this court can't apply plain error if we invited the error. Certainly, Mr. Connor, it didn't invite the error. On the merits, there's no qualifying language in Section 25G2, unlike other sections of the fitness provisions, Article 104, like 104.13 and 104.17. Doesn't that signal that all unfitness is to be considered on equal footing and that the trial court was required to make a determination whether the proof was satisfied either or both standards? No. And the reason for that is more complicated. There's a statutory construction reason why that doesn't apply, and there's also a constitutional reason. Do we get to statutory construction issues if the statute that we're looking at is unambiguous on its face? Doesn't there have to be a showing or some showing that the statute on its face is ambiguous? Well, Judge, I think that … What's ambiguous about the language of 25G2? Well, whether you have to take the mental illness into account or whether you don't. The statute says, the court shall determine whether he or she is subject to involuntary commitment under the Mental Health Code or constitutes a serious threat to public safety. Isn't that or? Isn't that clear? It's one or the other, or it could be both? Certainly the statute is written, says or. It could be one or the other. Or it could be both. But when you have a mentally ill defendant or a defendant who had been found unfit as a result of a mental disorder or a mental condition, it is ambiguous. It then becomes ambiguous. Should we apply the involuntary remission standard or do we apply the serious threat standard? And that's where the constitutional limitation comes in. Under, I suppose, starting with Foucha v. Louisiana and then Young, I think the SVP cases, Crane and Hendricks, have something to say on that as well. And essentially what it says is that, on its face, the serious threat to public safety doesn't contain any consideration of the person's mental illness whatsoever. It's not on there. Well, you'd have to be an unfit defendant in order to even be under the Act. But you could be unfit for a solely due to physical reasons. You could be a murderer who loses his arms or legs and has to be hospitalized and unfit because he or she has a physical condition and just can't withstand the rigors of a trial. But you could still pose a danger. Absolutely, you could still pose a danger. And the question is, that person clearly wouldn't be subject to involuntary admission because he doesn't have a mental disorder. No, but he's incapacitated. Right, and so if the state still wants to civilly commit him, they would have to go under the latter provision just based on who the defendant is. And if we look at who the defendant is in this case, it's a person with delusional disorder. And the question becomes, which one do we apply? I think it's the EB case. Actually, let me look at the EADS case I cited. It says we have two statutory provisions, one general and one specific. And the specific one applies to the specific facts of the case. And if it's the facts of the case, you apply the specific one. So we have two statutory provisions. Which one applies and one observes? The one that's talking about mental health, the involuntary admission standard, which talks about whether due to his mental illness, he's reasonably expected to engage in conduct that would cause another physical harm. That is the standard for commitment under, for one observes because he's mentally ill. The General Assembly chose not to include that language. And it's clear that the General Assembly knew and separated mental illness from physical disability in other sections of the code, but not in this provision. And we presume that the General Assembly was familiar with the case law, familiar with the mental health code, correct? Correct. We do presume that. And the reason they left it in there, we can presume, is that because individuals who don't have a mental illness can nonetheless be unfit and could still be subject to civil commitment. And so it's in there for that reason and that reason alone. That's what the Young case says. Well, we are not required to follow Young. And how does Young really help your case? Young helps my case because Young says that the reason it answers your honest question, the reason the serious threat to public safety was included by the legislature is specifically to deal with unfit defendants who are unfit solely due to a physical condition. And it says that the mentally unfit are subject to civil commitment under the involuntary admission standard. And so that, I mean, it's a construal of the statute. And the legislature didn't amend the statute after Young. I mean, it was almost 20, 25 years ago that Young was decided. They left it in there. And so it's presumed that they've acquiesced to the court's construal of the statute. That kind of dovetails into your reliance on Lange. How is Lange helpful to you where it does not deal with the same statute and the fact that since Lange, the General Assembly has amended the Mental Health Code? Well, Lange helps in this way on that issue. It helps on the due process constitutional issue. If we go back to Foucha, Foucha was someone who had been convicted and was mentally ill and had been civilly committed. And this was in Louisiana. He applied for release. He was no longer mentally ill, but the court concluded that he was still dangerous. Louisiana Supreme Court says he can still be confined, civilly committed. The U.S. Supreme Court says no. It asks that your reason for your civil commitment has to bear some rational relation to the reason you were committed in the first place. So if there's a mental illness, the mental illness still has to be present. It can't be a warehousing operation. Well, there's no question here the mental illness is still present. To answer the court's question about Lange, Lange provides that next piece. And what Lange says is that what was challenged in Lange was the definition of mental illness. And also the length of his being in a secure setting without a hearing. Sure, without a hearing. Based upon amendments to the statute, the defendant is entitled to 180-day reviews as long as he remains in a secure setting. Sure. He also demanded a fitness hearing.  Just to the next point, my next question is, does each time get the report every 180 days? Does there have to be another hearing? Yes. Under section G2I, yes. There has to be another hearing, but the hearing is a different hearing. That satisfies the Lange concerns, does it not? Well, it satisfies that Lange concern, but not the other Lange concern. The first Lange concern, the one that I wanted to address, is that it said that the mental illness at issue, it can't be ADHD, it can't be anxiety. It's got to be serious enough that it causes the person to engage in conduct that results in physical harm to someone else. And the Lange court said consistent with due process. That's why the legislature put that in there. That's why they used that definition, because there is a coupling. If you can finish, did you finish that answer? There is a coupling with the mental illness and the reason why the person is committed. And that's how Lange informs the constitutional due process analysis that came up in FAUJA and that extended through a lot of cases as recently as Hendricks and Crane. That civil commitment has to bear some rational relation to the reason why the person is there to begin with. It can't just be that they're dangerous. And that's how due process is involved here, that we have a hearing? I'm confused on that particular issue. What's the real due process issue here? The due process issue is that the serious threat to public safety does not take into consideration the reason why the person was committed in the first place. And when you're talking about someone whose arms and legs are cut off and who's killed someone, it would make sense that you don't include that in the definition serious threat to public safety, because there doesn't have to be a coupling. That doesn't have to be the cause of the serious threat, the fact that the person's arms and legs are cut off. They are a serious threat maybe in spite of the fact that they have their arms and legs cut off. They're so dangerous that in spite of that limiting condition and they can't communicate with their attorney, they're still dangerous. But the trial court relied upon Dr. Muhammad's opinions about the defendant's dangerousness. Correct, but that opinion is only good as the facts that it's based on. And as I laid out in the brief, the court also considered each of those 180-day reports, which document a history of a pretty docile letter of service. But in your brief, you didn't argue that the state failed to prove serious threat, did you? I did. I said that the doctor never said serious threat. He never explicitly said that. He did. It's not in his testimony. Well, he used the phrases that if the defendant wasn't in a secure setting, he anticipated it would escalate and could become violent. And I'm paraphrasing. Sure, but even that's not enough. Even that isn't enough. That opinion isn't enough of an opinion to commit someone as a serious threat to public safety. But was there any opposing medical information that would challenge that presented? In what sense? The defendant didn't call any witnesses. All right, so that's the only information that we have. Well, he did cross-examine. A robust cross-examination. Very robust cross-examination. It showed that he had never engaged in a single act of physical violence or physical aggression. And frankly, the kind of actions, the kind of disruptions he caused are the kinds of disruptions that the court in Kutzinger found weren't sufficient to allow for civil commitment. He's locked up in a mental institution. There's frustration with staff, with other people who are mentally disordered, and there's to be expected that there's somebody. They did intervene in that they gave him calming drugs, Halodol, and another one that I can't remember the name of, lorazepam maybe? Or that might be the other name for Halodol. So without that, basically the doctor's saying he is a danger. We could control it here. Who's going to control it there? That is what the doctor said, but I don't think he ever said that he was a serious threat to public safety. What he said is that there were some instances where he became loud on the unit and had to be administered medication. That is true. But what he never said is that he became loud on the unit, had to be administered medication, because of his delusional disorder. If that was the reason he became loud, because no one's treating the green goo in his head, and no one's listening to him, and that becomes an issue, and because of those delusions he became loud and had to be medicated, we'd have a different case. That wasn't the testimony. Well, that's what happened when Dr. Latham saw him originally. He said, just give me an operation. I want an operation to get rid of the green goo. And so he was a bit aggressive at that time. I think there's a difference between being assertive and saying I had green goo in my head and being frustrated that no one's listening to you because you're suffering from a delusion and being likely to engage in conduct that's going to threaten physical harm with someone else or to seriously threaten the public safety. This guy was pulled over for making a left turn in a right turn only lane. Well, that could be pretty dangerous. But what do you really want us to do here, Mr. Adasnik? I guess that's the bottom line. What are you asking us to do? What I want you to do is vacate the original civil commitment. It was not under the proper standard under the code, and it's not consistent with the due process clause of the Constitution, because the court's finding doesn't connect delusional disorder to the serious threat, can't. It doesn't even take it into consideration. The evidence wasn't there. So I want you to reverse that. And in the event that you don't, I want you to remand the case for the Section G2I hearing at which the doctor only testified that under that, under the G2I hearing, the 180-day hearing, the standard's different. They have to say that due to a mental illness, he's reasonably expected to inflict serious bodily harm, not just bodily harm, not just be a danger, not just might benefit from mental health treatment, that in need of mental health services in the form of inpatient care, Section 104.25G2 says that we need to look to the Code of Corrections, Section 524, and that says that he's reasonably expected to inflict serious bodily harm. There was no testimony at the 180-day hearing that he was reasonably expected to inflict serious, not just bodily harm, serious bodily harm. In fact, I think the testimony was precisely the opposite. In the last year since 2022, he's not had a single outburst or incident on the unit or in the hospital. And so in the event that you don't vacate the civil commitment altogether, I'd ask that you reverse it and reverse the G2I hearing on these consolidated appeals. And ask the court to determine whether he's in need of mental health services, but not subject to involuntary admission or inpatient treatment. So in other words, does he need outpatient treatment and what form of outpatient treatment? All right. Thank you. All right. You'll have an opportunity to respond after counsel if you choose to do so. Thank you. Ms. Hartley? Good morning. Thank you, Your Honor. Yeah, we're still there. Okay. May I please report? Stephanie, leave for the people. Our position is that you first actually need to analyze whether this was, in fact, invited error, which is what we believe the Harding case would apply to. If you look at what was said by the defense counsel, he said that he argued that there was nothing showing he was a danger or that he was reasonably expected to inflict serious physical harm. The court said the statute allows the public safety. He responded, my analysis is that it's an either or, that he is either subject to it or subject to the other. The language about my analysis is slightly different, is actually being embellished quite a bit from what's in the record on page 374. Let me ask this. Why did you wait until five days before oral argument to request to cite additional authority when the reply brief was filed on April 4th of 2024? And I do apologize for that. Some of that is when we get ready for our moves. I know that the reply brief was the first time that plain error was raised at all. So certainly it was. But a reply brief is, what's the purpose of a reply brief? It's to respond to the state's arguments, isn't it? Correct, except that plain error is not supposed to be raised in reply under the rules, and it in fact was. Regardless, I think if you start with the invited area, that would preclude plain error review. If you don't look at the invited piece of it, you would move on next to the forfeiture piece, which is here the exact reason that you would in fact invoke a forfeiture is because this was never explored below. And the court certainly made it clear that he was focusing on the alternative of serious threat to public safety, but never actually ruled out the other. Didn't need to make that finding because it was an either or. And in terms of this statute, if we were to get to the statutory analysis piece, which people argue that should not happen here, this is two different statutes that's in conflict with each other where we would start looking at general versus specific. What you have is one statute with multiple alternatives. In my brief, I gave the example of the ground one fitness concern or responsibility or interest. You could actually fit. I mean, it's almost like a Venn diagram. You could fit. There could be overlap. There could be some that's included in both. Another example of that would be our battery statute where something could be insulting and provoking, but not necessarily bodily harm, and yet it could also constitute both. We have many, many statutes where there's an or. And unless there's some ambiguity, as Your Honor pointed out, you don't get to all of the things about what it means, what else should we do here. But the fact of the matter is the court made a finding that this particular defendant was a threat to the public safety. I submit there's no word dangerous in this statutory code at all. And those two things are not mutually exclusive, so we've got what the court found, which is a threat to public safety. When you look at the doctor's testimony, he actually did testify that this particular defendant could have a high risk of inflicting harm on others. He said outside when he's not in a controlled environment, he risks overstimulation. It can worsen his delusion. Then there's a high likelihood that he would overreact, get paranoid, bring others into his delusion, and could cause harm to them. That's our 328-29. So there's certainly a support for it. The other thing is this is a G-2. This is how we got here. So it is always considering the reason we got here, which was that this defendant was found not guilty of very serious offenses. What he was doing was on a cannabis-fueled mission at 2 something in the morning. He tells the hospital, oh, I'm not planning to shoot you. Well, that could very easily come off as a threat. Then when he's pulled over, he has a fire-ready weapon in his car without FOI, without concealed carry. One bullet in the chamber, ready to be fired, eight bullets in there. That's when he has access to weapons and to cannabis. This was in 2019. It's not that long ago, and he was actually found not guilty of that offense. Of course that plays into the analysis. As far as his behavior in the unit, he threatened to break somebody's TV. He did have to be medicated on an emergency basis. He was refusing treatment, which the doctor's opinion was that that puts him at a risk, especially when he would be out of a secured environment. What about the trial court's suggestion for trying to encourage the defendant to cooperate with treatment? Isn't that flipping the burden on the defendant? I don't think so. Is there any control by clearing convincing evidence that the defendant posed a serious threat to public safety? Right. If I recall correctly in the record, this is where we actually have to separate issue one and two. My recollection is that was much more focused in the second hearing. In the second hearing, there are multiple options. One of the options is whether he's in need of mental health services in the form of inpatient care. That finding would be sufficient at that 180-day hearing. It's a little bit different of an issue for one thing at the second issue. But in terms of saying to the defendant, you know, somebody who's mentally ill, somebody who's unfit, they're actually in the reports. If you look at them, there were times he was almost convinced, he was thinking about it, maybe he would take the medicine. I think that the judge, as he's facing the defendant in open court, is trying to explain to this defendant, cooperate with your doctors. You have this shot. I mean, just because he's mentally ill, you can't assume that he's completely incompetent. He's not. But he is, in fact, refusing treatment. And he's unable to safely conduct himself outside of this secured environment, which is why he's in need of the mental health on an inpatient basis. I think the court had every right to try to convince this defendant that he might want to think about listening to his doctors. And I know that the defendant doesn't tend to listen to doctors. He didn't believe that he didn't have this goo in his head. He didn't believe that there wasn't some. But the other thing is that he believed that that goo was injected possibly by a gang member. He was agitated about that. So his delusion, in fact, encompassed dangerous facts that led to his canvass-fueled mission to go around with this loaded gun and convince somebody to maybe give him an MRI and prove that he was right. Again, even if the judge spoke and shouldn't have said that, which I don't concede, I don't believe that undermines the clear and convincing evidence that this is a defendant that is in need of mental health services in the form of inpatient treatment. And so to the extent sufficiency of the evidence is raised as to Issue 2, that second hearing, I believe that the evidence more than supports that. As to the first issue, my reading of the argument is that there is no sufficiency claim. There is a due process claim, but there is no analysis of the Matthews factors. There is no analysis. Is he saying it's facial unconstitutional? Is this as applied? We have no analysis of that. And again, what you have is a not-guilty defendant. So he's got the 180-day reviews. He's got the end as tied to his offense. He can be held no longer than his offense under this section. And he also has, you know, they put burdensome proofs in, they put time limits. There's all kinds of things in here that defeat that constitutionality argument were it to be developed, which I don't really see that it is here. Can you address Young? Young. Is Young the fourth district that, yes. So what Young said, and I maintain that that is in fact DICSA, that because the argument there was a physically unfit person couldn't be committed at all. And in making the analysis that, yes, in fact they could because they could be a serious threat to public safety. Unfortunately, the fourth district went on to explain that that must preclude the other. But that was totally not necessary to this decision. We know that that physically fit person might not fit under the first one, mentally ill, although it could have been both. But the fact of the matter is, again, it's this overlap. You could have somebody who fits into both categories. You could have someone who fits into only one. And that's any of these statutes that have these four alternatives. We never, you know, the court never found that the other was precluded. And I don't even think in Young that was found that the other was precluded. What the court had found was this physically unfit person was a serious threat to the public. So the fourth district did not need to go into that analysis. And it is, in fact, DICTA. And the other thing is you don't get into the public policy or why we do this or any of these things if the statute is clear on its face. So we shouldn't even really be getting there to begin with. The other thing I would just point out, I know counsel in opening had mentioned, you know, could this court affirm on any basis 100% that is possible. The problem here is it wasn't explored. And to the extent that two options under the Mental Health Code have been pointed out repeatedly, there is, in fact, a third option. So if this court were to, for some reason, go into that analysis, you would need to look at all three possibilities under the Mental Health Code. And one of those includes that they don't take their medicine, they're refusing treatment, and that if they escalate, they would become meeting under one or two. I still think there are some differences in the two. And, you know, certainly this is an either-or, just as defense counsel conceded below, just as the court found. And that is our argument on appeal as well. I think, unless there are other questions. Not at this time. Okay, thank you. I would ask this court to affirm.  All right, Mr. Radancevich, if you wish to, you may. If the state can't cite a single case where someone with a mental illness has been simply committed as a serious threat to public safety, and a serious threat to public safety alone. They cite the Reschitis case. It's not what the court did. They found that Reschitis was subject to involuntary admission and a serious threat. They found both. They can't cite a single case. Why is that? If the statute is so clear. Why is that? And this is a due process argument. This is a due process argument. It's, in some respects, maybe I should have gone through the Matthews factors. When we're dealing with a civil commitment, we're not punishing, but we are incarcerating someone for what they might do in the future. Their liberty is clearly at stake. That's an important liberty interest. And there is a whole body of case law going back to the 70s in the U.S. Supreme Court and in Illinois about civil commitment and due process. And what comports with due process in civil commitment circumstances, and what does not comport with due process in civil commitment circumstances? And the, at least in Illinois, the U.S. Supreme Court said that there has to be some coupling of a mental illness with the dangerousness. If you're trying to civilly commit someone as a dangerous person, whether that be in the sex offender context, sexually violent predator laws, people be claimed. They said there has to be a finding that the person has a loss of volitional control due to the mental illness that causes them to be dangerous. In Illinois, under the SDP Act, consistent with due process, the Supreme Court has routinely said, and the Illinois Supreme Court has routinely said, there has to be a finding of current dangerousness, a current mental illness that causes and a demonstrated propensity to commit violence, and a current propensity for the future. The due process argument is pretty straightforward. That before you can civilly commit someone for a mental illness, which is why letter of service is in DHS custody to begin with, you have to make a finding that that mental illness bears some relationship to their dangerousness. There was no, that didn't happen. And on its face, the serious threat to public safety, the whole serious threat, doesn't even include that. It doesn't even require you to look at the mental illness. It doesn't even, and so it doesn't comport with due process. And you just simply adopt a young court that says that the reason that's there is because you can also be unfit due to a physical condition. And the case, the NYEB case that I cited, which cites the Wyoming Supreme Court, and that's an Illinois Supreme Court case, they said, listen, when you hammer in a sentence, the stuff that comes after the or is presumed to refer to a different subject matter than the stuff before the or. In this case, the stuff before the or is the involuntary admission. Well, we're talking about mental health. Well, we're talking about whether that person's mental illness causes them to either engage in conduct that's reasonably likely to place another in physical harm or causes them to be unable to care for themselves, which clearly wasn't one observed statue. His mood was good. His grooming was good. He was able to care for himself. Well, the section before the or deals with mental illness, and so the section after the or has got to deal with something else. What is that something else? What is that something else if it's not mental illness? And that's where the young court comes in and says, well, that something else is for people who are unfit due to a physical condition. Well, it should be mental illnesses in degrees, right? There are a lot of people who are functioning in society who are mentally ill, but they can perform ordinary skills and they can engage. That's correct. That's correct. In treatment or on medication. And here the defendant is unfit because of mental illness. He doesn't fit the definition of the mental health code in terms of commitment under the mental health code. But the opinion of the experts is that he poses a danger to society. But listen, if he had ADHD or his delusional disorder prevented him from communicating with his attorney, because there was at one point one of the DHS doctors said, he's fit with special provisions. The special provision is just don't ask him about this and understand that he's probably going to talk about it from time to time. That was a special provision. But he was calm, kind, wasn't participating in a group, wasn't taking his meds. But other than that, he was more or less fine. There has to be, and that's where Lange and that's where this due process argument resurfaces. If I could just finish this thought. Yes. That's where Lange and due process concerns resurface because you're right. There is a continuum of mental illness. That's why due process concerns were addressed by the General Assembly after Lange. Guaranteeing due process in a courtroom where you have an opportunity to present evidence that you should be released. That's procedural due process as opposed to the substantive due process concern that the civil commitment itself, the fact that you're there to have that hearing, has to bear some relation to the mental illness. Lange, the 1986 Lange court, in addition to saying you have to have a 180-day hearing, in addition to saying you have a due process right to demand a fitness hearing to clear your name at trial, in addition to those things, they said that the legislature included the term mental illness, which is on a continuum, and defined it to mean that you're reasonably expected, due to your mental illness, to engage in conduct that's likely to harm someone else. And they said that separates, that's consistent with due process, because that separates the mentally ill who due to their mental illness are going to cause somebody harm and the mentally ill who might be mentally ill and might harm someone. I can have ADHD and still be a murderer. That doesn't mean I can be civilly committed under G-2. There has to be some connection between the mental illness and the danger that I could cause in order for there to be a civil commitment. Otherwise, due process isn't satisfied. Justice Kennedy. Thank you. Thank you very much for your arguments today. It is now afternoon, so we will now adjourn for the day. And we will get a decision to you in due course. Thank you.